# Wier's Appeal.

1. A business which is useful and necessary in large communities, and which is not a nuisance of itself, may become so in view of the circumstances in the neighborhood in which it is proposed to carry it on.

2. There is a distinction between a long-established business, which has become a nuisance in a locality from the increase of population, &c., and a new erection threatened in such vicinity.

3. Carrying on an offensive trade for any number of years in a place remote from buildings and public roads, does not authorize its continuance there when *houses have been built and roads laid out and it is a nuisance to* the occupants and travellers.

4. It requires a much clearer case for a chancellor to compel the removal of an establishment in which the owner has invested his capital and carried on business for a long time, than of one to be established for the first time, against notice that there will be application to equity to prevent it.

5. The legislature has recognised that the storing of gunpowder in large quantities in thickly settled places is a nuisance to be guarded against by public authority.

6. The erection of a powder-house was in this case restrained, without the existence of actual irreparable damage, but to prevent it.

7. Circumstances in this case sufficient to restrain the erection and maintenance of a powder-magazine.

8. Rhodes *v.* Dunbar, 7 P. F. Smith 274, followed.

October 9th 1873. Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Appeal from the Court of Common Pleas of *Allegheny county* : In Equity : No. 159, to October and November Term 1872.

[Wier's Appeal.]

This was a bill filed June 30th 1871, by James G. Wier and twelve others against Arthur Kirk, for an injunction to restrain him from erecting and maintaining a powder magazine in Indiana township, near dwellings of the complainants, in the neighborhood of the borough of Sharpsburg.

The bill set out :—

1. The plaintiffs were residents and property-holders as above stated.

2. The defendant, Arthur Kirk, is owner of a piece of ground, of about nine acres, situate in said township, lying on the Sharpsburg and Kittanning turnpike road, and bounded by lands of said James G. Wier, John C. Noble, Henry Noble and Anthony Boyer.

3. The said Arthur Kirk, the defendant, has recently commenced to excavate and prepare for the erection of a building upon his said lot or piece of ground aforesaid; and plaintiffs are advised and verily believe, and so expressly charge, that the said defendant is about and intends to erect and establish on his said premises aforesaid, a powder-magazine, or place to store gunpowder, and to place in said building, when completed, and to keep in store therein large quantities of gunpowder.

4. From the place where defendant contemplates erecting said powder-house or magazine, to said turnpike road, the distance is only about ninety-two feet; to the dwelling of James G. Wier, is five hundred and eighteen feet; and two hundred and fifty feet only from the line of said Wier's lot. To the dwelling of said Anthony Boyer, is about nine hundred and fifty feet, and from the line of his lot one hundred and forty-two feet. From the line of Dr. Henderson's lot seven hundred and three feet. From the line of John C. Noble two hundred and twenty-eight feet. From the line of Henry Noble's land about six hundred feet. From the line of Wm. Henderson's lot about seven hundred and eighty-eight feet; and from his dwelling ten hundred and eight feet. From the line of J. S. McPherson's lot thirteen hundred and eight feet.

The property of other plaintiffs is all in the immediate neighborhood.

There are also many other dwellings of small lot-holders in the immediate neighborhood.

The immediate neighborhood is thickly settled and fast filling up with buildings, dwellings and other improvements.

5. The erection and maintaining of a powder-house or magazine on the premises aforesaid, would greatly endanger the lives of your orators, and their families and servants, from explosion; and also the lives and property of the public travelling on said Sharpsburg and Kittanning turnpike-road.

The contemplated construction of said powder-house or maga-

zine, by said defendant, has already greatly depreciated the value of property of said plaintiffs, and of all real estate in the neighborhood. If the same is erected and maintained it will be a common nuisance.

When your orators first heard of said defendant purchasing said premises for the purpose aforesaid, they gave him notice not to attempt to locate a powder-magazine on said premises, and believing that he might and would disregard the remonstrance of the neighborhood, they had formal written notice served upon him on the 9th of June 1871.

The prayers were for an injunction restraining defendant from erecting and constructing, or maintaining a powder-house or powder-magazine on the premises aforesaid; and for further relief.

A preliminary injunction was granted, according to the prayer of the bill.

The defendant answered:—

1. He denied that any of the plaintiffs resided or owned property so near to his building as rendered it probable that any one of them or their families would ever sustain damage to their persons or property.

2. He admitted that he had purchased the property mentioned in the bill at a cost of over $5500, for the purpose of erecting on it a safe, suitable and proper house for the storage of powder, which is required to be kept on hand by him as a legitimate dealer in that article of commerce, to enable him to carry on that business and supply the demands of the Pittsburg market. He admitted the distance of the lot from Sharpsburg as set out in the bill.

3. He denied that it was his intention to store in it powder in such quantities as to justify a reasonable apprehension of danger to the plaintiffs, &c. This paragraph describes the location and construction of the magazine, and avers that it had cost him $9000.

5. States the distances from the magazine to the turnpike, and to the several properties of the plaintiffs.

6. Denied all the allegations of the 5th paragraph of the bill, and averred that he intended "to erect a small powder-house, or magazine, of the most approved style of fire-proof buildings for that purpose; its roof and sides to be covered with slate, and to combine in its construction and management everything that science and experience in the business have demonstrated to be necessary in order to prevent accident or damage and to secure entire safety."

He denied that it would be a common nuisance, and averred that "powder is a necessary article of daily consumption and use at Pittsburg and vicinity, and in his said business he is required to keep it constantly on hand for immediate delivery to the mining, quarrying and manufacturing establishments in this vicinity, and

that it is utterly impossible for him to carry on his said business and supply the demand for the Pittsburg trade, in case he is prohibited from erecting and maintaining a suitable and proper house or magazine, within convenient reach of the city, in which he can store his stock on hand; and that there is no other location known to him within practical reach of the city, which can be used for this purpose with so great safety to the surrounding residents, property-owners and the public as that upon which he is now erecting his said store-house."

C. J. Fetterman, Esq., was appointed examiner and master to take testimony and report the facts. He examined many witnesses, drafts, &c., submitted to him. He reported:—

"The powder-magazine in controversy, belonging to Arthur Kirk, the defendant, is built on a piece of land owned by himself, situated in Indiana township, Allegheny county, Pennsylvania; the land abutting on the Sharpsburg and Kittanning turnpike, one of the principal roads leading from the borough of Sharpsburg back into the adjacent townships.

"The magazine stands in a ravine, the axis of which is apparently from south-east to north-west, and at a right angle with the turnpike. The descent of the ravine and the open side thereof with respect to the magazine, being towards the north-west, fronting towards the turnpike; the natural angle or rise of the ravine from the turnpike being from twenty-five to thirty degrees. The magazine stands in an excavation made entirely across the ravine, about twelve or thirteen feet in depth vertically; the nature of the stratifications in which the excavation is made being, for four or five feet from the surface, earth and loose slate, and the remainder of the depth a very hard slate rock. The walls or sides of the excavation are vertical. The magazine is a very light frame structure, the lumber used in its construction being pine, a species of timber offering the least resistance in case of an explosion, and being as light as would be consistent with safety and a due regard to the purpose for which the building is to be used. There is but one door or opening in the building. The floor thereof is well secured by secret nails. The sills and joists of the building rest on a bench of slate rock, about four feet higher than the bottom of the excavation proper, and the whole exterior, including the roof, being well covered with slate; it was completed in the month of July 1871. The magazine is built on the plan now generally adopted, and highly approved for merchant magazines, as testified to by several witnesses of great knowledge and long experience in the construction of and superintending powder-magazines.

"Shortly after the magazine was completed, a quantity of powder in kegs was placed therein; probably four hundred or five hundred kegs; but the exact number was not known by the witnesses. Since then a large portion of it has been removed.

" The turnpike opposite the magazine is about forty feet wide, and from the centre thereof to the magazine the distance is one hundred and fifteen feet, or ninety-five feet from the inner edge of the pike to the magazine. The distance from the nearest point on the line of the borough of Sharpsburg to the magazine is about thirty-four hundred and fifty feet. Following the line of the turnpike, and by an air-line, the distance would be somewhat over one-half of a mile. The magazine is not visible from Sharpsburg, as there are several high hills between Sharpsburg and the magazine.

" From the magazine to the dwelling of James G. Wier, one of the plaintiffs, the distance is about five hundred and ten feet, and from the line of his lot to the magazine the distance is about two hundred and fifty feet. On an air-line these distances would not be so great, as there is a hill about eighty feet high intervening, and the dwelling also standing somewhat upon the side of a second hill, considerably above the level of the magazine. Wier's house is not visible from any point of the excavation in which the magazine stands, the view being entirely obstructed by the intervening hill; but sighting on a line with the south end of the comb of the roof of the magazine, two or three of the upper courses of brick, in the extreme left chimney of the house, may be seen; and from a point immediately in the rear of the magazine, on the side of the hill, three or four feet above the comb of the roof of the magazine, an ordinary-sized man, by standing erect, can see the upper story of Mr. Wier's house.

" The distance from the dwelling-house of Andrew Boyer, also one of the plaintiffs, to the magazine, is about nine hundred and ninety feet, his land abutting on the turnpike about one hundred and thirty-five feet from a point on the turnpike opposite the magazine. The house stands on the top of the hill on the opposite side of the ravine, along which the turnpike leads from the magazine, and somewhat to the left of the magazine. On an air-line the distance would not be so great. There is considerable timber standing on the side of the hill, which in a great measure obstructs the view of the house from any point immediately around the magazine. The house is not visible from the inside of the excavation, because of a portion of the hill in its natural state forming the wall of the excavation next to the turnpike. The house may be indistinctly seen through the timber from different points on the side of the hill above the level of the roof of the magazine, and possibly from a point outside of the excavation below the magazine, towards the turnpike; but the outside wall of the excavation, next to the turnpike, completely shuts out the view of the house from the magazine itself.

" The distance from the tenant-house of W. G. M. Henderson, one of the plaintiffs, to the magazine is about eleven hundred feet,

and to his own dwelling about twelve hundred feet, and about seven hundred feet to the line of his land. The dwelling-house stands on the opposite side of the ravine from the magazine, and somewhat to the right of it, with considerable timber standing on the hillside between it and the magazine. The dwelling is not visible from any part of the excavation in which the magazine stands, by reason of the point of the hill on the north-east side of the magazine projecting beyond the magazine almost to the edge of the turnpike; but from about the same point on the hillside above the magazine, where Wier's house can be seen, the dwelling of Mr. Henderson may be seen somewhat indistinctly through the timber. Mr. Henderson's tenant-house stands over the brow of the hill beyond his dwelling, and is not visible from any point about or above the magazine. The dwellings of Mr. Henderson and of James G. Wier and Andrew Boyer are the only houses in any way visible from the magazine, or from any point about it.

" Besides the four dwellings just mentioned, there are twenty to twenty-five other houses and buildings within a radius of one-half a mile of the magazine; but all, with the exception of those already mentioned, are entirely out of sight of the magazine, and separated from it by high hills and deep ravines; a greater part of the houses and buildings being on the extreme half-mile line, on a small stream called the West Branch, on the left of the turnpike, on which there are a number of houses. * * *

" Land in the neighborhood of the magazine is worth from five hundred to one thousand dollars per acre. The opinions of the witnesses as to the probable effect the magazine in its present location will have upon the value of the land, are very conflicting. A number of the witnesses testify that it will depreciate the land to fully one-half its value; others allege that it will be depreci-ated almost its full value; while others again assert that it will have very little if any effect. The witnesses evidently based their opinions upon their knowledge of the nature of powder and their experience in its use. Those having the least familiarity with its nature and use, alleging the greatest depreciation; while those having an intimate knowledge of, and long experience in the use of powder, say that the present location of the magazine will cause scarcely any appreciable diminution in the value of property in the vicinity. The witnesses could not testify to any actual depreciation in the value of property; their opinions were pre-dicated of what they supposed or imagined would be the probable effect; their estimates of the damages being altogether speculative and contingent. In the neighborhood of the magazine the land is owned generally in lots of ten acres, up to large farms of from one hundred to two hundred acres: a considerable portion of which is timber land, the cleared land being used for ordinary agricul-tural purposes. At the present time this section of the country

[Wier's Appeal.]

is about as thickly settled as ordinary agricultural districts gene-rally are. In a few years, as the population of the cities and suburbs increase, and their limits are extended, these lands around and in the vicinity of the magazine, may be much sought after for building sites, for country residences, and homes for the laboring classes; but there is now too much more desirable and convenient land nearer the business centre to meet the present demands of the people, to give any reasonable ground for believing that this section of the country in the immediate neighborhood of the magazine, will soon be much more thickly populated than it now is.

"Mr. Wier, Mr. Noble, and one or two other persons that were called as witnesses in the case, testified that they were more or less apprehensive of danger to their families and property from the present location of the magazine, and asserted that they were constantly uneasy as to their safety, and annoyed by the complaints and fears of their wives and children, as well as their own personal annoyance, and fear of the possibility of an explosion of the magazine and the probable consequences thereof.

"Powder is a necessary and staple article of consumption in Pittsburg and vicinity, being used for mining, quarrying and other purposes.    The yearly consumption being, on an average, ten thousand to fifteen thousand kegs; and, to conduct the powder trade properly and safely, it is absolutely necessary to have suit-able and well-built magazines, in safe and convenient locations near the city, so that the principal stock of powder necessary to be kept on hand to meet the demands of the trade, may be stored therein.    (The average stock of powder necessary to make an assortment to meet the demands of the trade of Pittsburg, being from one thousand to three thousand kegs.)    The magazines should be in such convenient places, having a due regard to the safety of the surroundings, as to permit teams to go from the city to them and back during the day, and allow reasonable time for the ship-ment of the powder to fill orders, &c.

"From the peculiar and well-selected location of Mr. Kirk's magazine, the comb of the roof extending scarcely above the upper edge of the excavation, with considerable timber standing on the hills and in the ravines surrounding it, it is comparatively secure from lightning or fire, or from any other cause, unless managed with the grossest carelessness and negligence, or fired by the hand of an incendiary; who, in all probability, would be the only victim of his own rashness and villany. * * *

" In case of the explosion of any quantity of powder, the direct danger from the explosion is increased according to the smoothness of the surface, and of course diminished according to its rough, broken and hilly character.    Were the magazine in controversy to explode, while four hundred to six hundred kegs of powder were

[Wier's Appeal.]

stored in it, the direct effect of the explosive force would be to strike the walls of the excavation, blowing off all the surface and loose rock down to the solid slate rock. This dirt, rock, &c., would be thrown in all directions, and if any of it was large enough, would be converted into projectiles, and thrown a considerable distance from the place of explosion, and might do considerable harm; but the main force of the explosion would be directed towards the open side of the excavation on the north-west side of the magazine, converting the excavation and ravine, as it were, into a large mortar, blowing all before it, and destroying everything that might be standing on the turnpike, or on the opposite hillside, within the focus of the mouth of the ravine. But there would be no direct danger to any building in the neighborhood from such an explosion. Any damage that would be occasioned, would be incidental, caused by flying projectiles, or the reactionary force of the atmosphere in filling up the vacuum caused by the displacement of the air, such as breaking glass, bursting in the doors, &c., and if a house chance to stand with its side to the magazine, it might possibly be thrown off its foundation. Mr. Wier's house is the only one that would be in any possible danger of being thrown over by the force of the concussion, and that danger would be comparatively slight, as the force of the explosion on the side next to his house would be in a great measure spent by the time it reached the top of the intervening hill, and then being able to exert itself in all directions, its force would still further be decreased by the time it reached his house, if indeed it might not possibly pass entirely over his house from the upward course it would receive on coming in contact with and glancing up the side of the hill next to the magazine, at an angle of about forty-five degrees.

" The allegations in the first four paragraphs of the complainants' bill, with the exception of the last three clauses in the fourth paragraph, and some slight discrepancies in the distances mentioned, are substantially true.

" I cannot discover from all the testimony in the case, that the land of any of the plaintiffs, except Messrs. Wier, Boyer, Henderson and Noble, lies in the immediate neighborhood of the magazine, nor ' that there are many other dwellings, and small lot-holders,' or ' that the immediate neighborhood is thickly settled and fast filling up with buildings, dwellings and other improvements,' as alleged in the last three clauses of the fourth paragraph of the bill.

" The master cannot adopt the allegations contained in the first clause of paragraph five of the bill, as being a strictly true and correct statement of the facts as they actually exist, but refers to the preceding pages of this report for the facts as they really exist, which are fairly and fully warranted by the testimony in the case.

[Wier's Appeal.]

" As to the second clause of the same paragraph, had the plaintiffs alleged that the damages to their property were merely speculative, contingent and eventual, they would have approximated more nearly the real state of facts, fairly deducible from the testimony.

" The allegations set forth in the sixth paragraph of the bill are substantially correct.

" The allegations contained in the answer of the defendant are substantially correct.

" The plaintiffs allege in the third clause of the fifth paragraph of their bill, that the erection and the continuing of the powder-magazine in controversy in its present location for the storage of gunpowder, ' is a common nuisance,' and invoke the extraordinary power of a court of equity to restrain and enjoin the defendant from further using the building for the purposes for which it is intended. * * *

"A powder-mill, magazine, chemical laboratory, soap factory, tin shop, &c., are not nuisances *per se ;* no trade, employment or business, which the law recognises as lawful and proper for man to engage in, can be such ; and from a careful examination of all the authorities within my reach, I have not been able to find a case wherein any lawful trade or calling has been held to be a nuisance *per se,* but become nuisances only by reason of the peculiar circumstances surrounding them. * * *

" The only Acts of Assembly in this state relating to powder are confined in their operations to the city of Philadelphia, regulating the transportation and storage of powder in the city, (Purd. Dig. 518, and the 31st section of the Act relating to Boroughs, Purd. Dig. 117), authorizing the borough authorities to limit and prescribe the quantity of powder, fireworks and turpentine, and other inflammable articles, and to prescribe such other safeguards as may be necessary, but omits making any of the acts therein specified nuisances ; nor are any of the above enumerated acts or articles mentioned in any statute relating to nuisances.

" Testing the present case in the absence of any statutory provision, by the principles enunciated in the cases already referred to, and by the facts as they exist in this case, there can be no question that the magazine in controversy is not a common nuisance, being constructed of the best and most suitable material; on the plan generally adopted for such buildings, at a reasonable and safe distance from any dwellings or highway, and protected in the best possible manner in its location, from fire or the effects of lightning, and owned and managed by a gentleman, to whom has been accorded every qualification and fitness for the management of such a building, the danger of an explosion is too remote to justify the fears and apprehensions which several of the witnesses seemed to entertain. But it is not contended that keeping powder in a

magazine properly constructed, may not, in cases of gross negligence, become dangerous and a nuisance; but that the storing of it in this way is lawful in itself, and not in every instance a nuisance, on account of the building being in the neighborhood of dwelling-houses or contiguous to public highways.

· "But conceding, for the present, that the magazine in controversy is a public or common nuisance, what is the position of the complainants? * * * The plaintiffs must charge the defendant with doing acts which constitute a private nuisance to them, and which must be established, not by the fears and apprehensions of the complainants, but by clear and satisfactory proof of actually existing danger. ·The fears of mankind, however reasonable, are not sufficient to create a nuisance.

"It is not alleged, on the part of the complainants, that there is any present actual danger to them or their property from the present location of the magazine, but that they are annoyed by the thought and apprehension that an explosion may possibly occur, and if they should chance to be in the vicinity, might possibly be killed or injured, or that their families might be injured and their property destroyed. Their estimates of the damages to their real estate are not based upon any facts, but merely speculative and conjectural, as to the probable contingent effect the use of the magazine for the storage of powder may have upon their property. There is no evidence of any actual depreciation in the value of their land, or that any of them have been prevented from selling their real estate by reason of the magazine in its present location, or that any persons have been deterred from purchasing land in the vicinity on account of the alleged danger, resulting from the proximity of the magazine; on the contrary, it was shown that during all the time the magazine was being built, lots were sold almost daily about one-half mile therefrom; and also that Dr. Henderson, one of the complainants, has, since the erection of the magazine, or rather since its commencement, with a full knowledge of its destined use, staked off ground within sight of and but a few hundred feet from the magazine, upon which he proposes to build himself a large residence. And further, there is no evidence in the case showing that any of the plaintiffs or their families have been or are suffering any annoyance or inconvenience other than their frequent dwelling upon the thought. of a possible explosion and the probable and contingent result thereof. * * *

"We may here repeat that it is shown by the most reliable testimony that this magazine is constructed upon the most approved plan and of the best and most suitable material, in the most secure and safe manner; that it is fully sufficient, in all respects, for the purpose for which it is intended, and may be used with safety to all parties, and that nothing but gross carelessness and negligence will render it liable to explosion. And even should an explosion

[Wier's Appeal.]

occur, it could scarcely endanger the complainants, for, as already stated, the building being located in an excavation in the ravine, the force of the explosion would be directed up the sides of the ravine, where there are no houses, and out of the mouth of the ravine, striking the opposite hillside, where there are likewise no houses within the focus of the mouth of the ravine; and there is but the slightest possibility that any person would chance to be on the pike opposite the ravine, just at the precise moment of explosion. The testimony shows nothing more than the apprehension of the complainants that, by the negligent and improper use of the magazine for the storage of powder, they or their families and property may be endangered. * * *

·" Believing, therefore, that the aspects in which we have considered this case are fully sustained by the several authorities cited, the master respectfully submits the following as his conclusions, arrived at after a careful examination of the testimony in the case:—

" 1. That the magazine in controversy is not a common nuisance, as alleged and charged in the third clause of the fifth paragraph of complainants' bill.

" 2. That the complainants have failed to show, by any means whatever, any grounds upon which to base any reasonable apprehension of danger to themselves, their families and property from the present location of the magazine in controversy, or that they have sustained any real, actual damage to or depreciation in their property, or that there is any reasonable apprehension of an explosion of the magazine while being used with reasonable care, for the purposes for which it is intended."

The master recommended a decree dissolving the injunction.

The defendant filed exceptions to the master's report. After argument, the court overruled the exceptions and confirmed the report, dismissed the bill and ordered that each party pay half the costs.

The plaintiffs appealed to the Supreme Court, and in a number of specifications assigned the overruling the exceptions and dismissing the bill for error.

*A. M. Brown* and *J. Barton* (with whom was *S. Schoyer, Jr.*), for appellants, cited Rhodes *v.* Dunbar, 7 P. F. Smith 274.

*G. Shiras* (with whom were *J. W. Kirker* and *T. W. Marshall*), for appellees.—A powder-magazine is not a nuisance *per se:* People *v.* Sands, 1 Johns. 78; Carpenter *v.* Cummings, 2 Phila. R. 74; Rhodes *v.* Dunbar, 7 P. F. Smith 274; Richards's Appeal, Id. 105; Huckenstine's Appeal, 20 Id. 102.

The opinion of the court was delivered, October 20th 1873, by

[Wier's Appeal.]

SHARSWOOD, J.— The great difficulty in all cases of this character is not in the ascertainment of the true rule of equity, but in the application of that rule to the facts. While it may be easy to draw the line between what is and what is not a nuisance, which equity ought to enjoin, it is by no means so easy to determine whether the circumstances of any particular case ought to place it on one side or the other of that line. It is rare that any number of men will be found to agree in their judgment upon such a question. One remark, however, may be hazarded, as preliminary to a brief consideration of the circumstances of this case, in which I think all will agree. There are many kinds of business, useful, and even necessary, in every large community, especially where manufacturing is carried on on a large scale, which certainly are not nuisances in themselves, but which nevertheless become so in view of the circumstances of the neighborhood in which it is proposed to establish them. The present Chief Justice, in his opinion at Nisi Prius, in Rhodes v. Dunbar, 7 P. F. Smith 275, enumerates twenty-nine kinds of such useful establishments which have been declared public nuisances. There is a very marked distinction to be observed in reason and equity between the case of a business long established in a particular locality, which has become a nuisance from the growth of population and the erection of dwellings in proximity to it, and that of a new erection threatened in such a vicinity. Carrying on an offensive trade for any number of years in a place remote from buildings and public roads, does not entitle the owner to continue it in the same place after houses have been built and roads laid out in the neighborhood, to the occupants of which and travellers upon which it is a nuisance. As the city extends, such nuisances should be removed to the vacant grounds beyond the immediate neighborhood of the residences of the citizens. This, public policy, as well as the health and comfort of the population of the city, demand: 7 P. F. Smith 275. It certainly ought to be a much clearer case, however, to justify a court of equity in stretching forth the strong arm of injunction to compel a man to remove an establishment in which he has invested his capital and been carrying on business for a long period of time, from that of one who comes into a neighborhood proposing to establish such a business for the first time, and who is met at the threshold of his enterprise by a remonstrance and notice that if he persists in his purpose, application will be made to a court of equity to prevent him. In the case before us the defendant occupies this position.

It is not contended that a powder-magazine—a building for storing large quantities of gunpowder—in the midst of a thickly-settled neighborhood, is not a nuisance. By the Act of Assembly of March 20th 1856, Pamph. L. 137, it is made unlawful for any person or persons to have or keep any quantity of gunpowder or

24 P. F. SMITH—16

gun-cotton in any house, store, shop, building, cellar or other place within the city of Philadelphia (except in the public magazines, or in a quantity not exceeding two pounds for private use), unless in the manner provided in the act, which provisions in the main are, that no person shall deal in the article without a license, and if licensed, shall not keep on hand more than twenty-five pounds, and shall have a painted sign distinctly legible to all passers-by, with the words "Licensed to sell gunpowder," and that every carriage for conveying the article shall have painted on each side, in letters distinctly legible to all passers-by, the word "Gunpowder." A public magazine has been erected, by the authority of the Commonwealth, near the mouth of the Schuylkill, and a state superintendent appointed, whose fees are regulated by law: Act of May 5th 1864, Pamph. L. 841. One of the general powers conferred upon boroughs by the Act of April 3d 1851, Pamph. L. 320, is "to prohibit within the borough the carrying on of any manufacture, art, trade or business, which may be noxious or offensive to the inhabitants; the manufacture, sale or exposure of fireworks or other inflammable or dangerous articles, and to limit and prescribe the quantities that may be kept in one place of gunpowder, fireworks, turpentine or other inflammable articles, and to prescribe such safeguards as may be necessary." Thus the legislature has recognised that the storing of gunpowder in large quantities in thickly-settled places, is a nuisance to be guarded against by public authority. But it is not confined to cities and boroughs. This court has acknowledged and declared it as a case clearly within the general rule of equity upon this subject, in the opinion of the majority as pronounced by Mr. Chief Justice Thompson, in Rhodes *v.* Dunbar, 7 P. F. Smith 274. After remarking upon the particular character and danger of the establishment, the subject-matter of the complaint in that case, which was a steam planing-mill, which had long been established in the neighborhood, had been burned down, and the injunction asked for was against its re-erection, and which the majority of the court thought was not within the rule—he proceeds: " These observations give no just grounds to draw the inference that a powder-magazine or depot of nitro-glycerine, or other like explosive materials, might not possibly be enjoined even if not prohibited, as they usually are, by ordinance or law. It is not on the ground alone of their liability to fire, primarily, or even secondarily, that they may possibly be dealt with as nuisances, but on account of their liability to explosion by contact with the smallest spark of fire, and the utter impossibility to guard against the consequences, or set bounds to the injury, which, being instantaneous, extends alike to property and persons within its reach. The destructiveness of these agents results from the irrepressible gases once set in motion, infinitely more than from fires which might

[Wier's Appeal.]

ensue as a consequence. Persons and property in the neighborhood of a burning building, let it burn ever so fiercely, in most cases have a chance of escaping injury. Not so when explosive forces instantly prostrate everything near them, as in the instances of powder, nitro-glycerine and other chemicals of an explosive or instantly inflammable nature." This reason is so cogent that nothing could be added which would increase its force.

All that remains, then, is to inquire whether the circumstances of the neighborhood in which it was proposed to establish the magazine in question, are such as to bring it within the rule. Let us remember that it is a new erection which is asked to be enjoined, not the continuance of an old one. Actual irreparable damage, actual depreciation of property, of course, does not exist. It is the prevention of these consequences which is the object of the process. Perhaps the immediate neighborhood is not so densely filled up—in connection with the evidence in the case of the careful construction and location of the building to guard against the worst probable consequences of an explosion—as would justify the court in ordering its removal. But, as we have shown, this is not the case. The neighborhood is not thickly settled, but it is fast filling up. Land is in demand for small buildings, villas and country residences, and its market value before this structure was contemplated was at a high figure. It is evident that it must sensibly affect that value and the growth of the district. This might not, however, be sufficient of itself. The borough of Sharpsburg is a thriving suburban village of this great western metropolis, where already many persons engaged in professional, mercantile or manufacturing business, have purchased sites, erected houses, and permanently reside, in order to escape from the smoke, soot and noise of the city. The distance of the structure complained of from the line of the borough is about half a mile. An explosion might do serious injury, at least, by breaking glass, even at that distance, and it is not beyond the reach of a projectile. It is all futile to sit down and calculate, as if by a mathematical *formula*, the force, size and direction of such a projectile. The natural laws which govern the direction of such forces are as yet undiscovered. It must, in the nature of things, be the merest conjecture. The evidence in the cause in regard to the explosion which occurred near Maysville, Kentucky, showed this very clearly. The house of the witness, Isaac Swartzwelder, was situated seven-eighths of a mile from the magazine. He said: "The explosion bursted every window and door of my house right open; it took the windows right out. There was a rock weighed eighty pounds; some one weighed it next morning. It fell right back of where I was sleeping, within eighteen inches of where I was lying." Another witness testified: "At the time the powder-house in Brooklyn, containing eight hundred or one thousand kegs of powder—eighteen to twenty tons—exploded, it broke glass at Fly-

market, New York city, clear across the sound, about three-fourths of a mile." One of the complainants, Mr. Weir, has his residence within five hundred and ten feet of the magazine, and there are several other residences further off, but still within the reach of the consequences of an explosion, if reliance is to be placed upon such facts as these. Even the witnesses for the defendant—some of them military men of great experience and sound judgment—admit there would be some danger from an explosion if it should occur, but they consider the danger as very slight, and that the location and construction of the building are well calculated to guard against the worst consequences. But besides all this, a public turnpike-road runs very near the building. As the master reports, " from the centre thereof to the magazine the distance is one hundred and fifteen feet, or ninety-five feet from the inner edge." It is peculiarly exposed to danger, for the magazine is constructed in a ravine, funnel-shaped, opening out towards the road. It presents, with its rocky bed and sides, a huge mortar aimed directly at the turnpike. We may take what the master reports upon this subject. " Were the magazine in controversy to explode while four hundred to six hundred kegs of powder were stored in it, the direct effect of the explosive force would be to strike the walls of the excavation, blowing off all the surface and loose rock down to the solid slate rock. This dirt, rock, &c., would be thrown in all directions, and, if any of it was large enough, would be converted into projectiles and thrown a considerable distance from the place of explosion, and might do considerable harm; but the main force of the explosion would be directed towards the open side of the excavation on the north-west side of the magazine, converting the excavation and ravine, as it were, into a large mortar, blowing all before it, and destroying everything that might be standing on the turnpike, or on the opposite hillside, within the focus of the mouth of the ravine."

We have come to the conclusion, then, that the complainants in the bill in the court below were entitled to the relief for which they prayed.

> Decree reversed, and now it is ordered and decreed that this cause be remitted to the court below, with direction to issue an injunction conformably to the prayer of the bill restraining the defendant, Arthur Kirk, from maintaining a powder-house or powder-magazine on the premises described in the bill, and from erecting and constructing such a powder-house or magazine in that vicinity.

> Costs of the appeal to be paid by the appellee.

WILLIAMS and MERCUR, JJ.—Upon the finding of the master, we think the bill in this case was properly dismissed, and would affirm the decree of the court below.