## CITY OF NEW CASTLE v. L. RANEY ET AL.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY, IN EQUITY.

Argued October 16, 1889—Decided January 6, 1890.
[To be reported.]

1. Upon a bill in equity to restrain or abate a public nuisance, if the matter complained of be not a nuisance per se, and if the testimony be conflicting whether it is a public nuisance at all or not, an injunction will not be granted until after the fact shall have been determined by a trial at law.
2. Where the testimony as to whether a mill-dam, maintained for its water-power for over half a century and about which a city has grown up, has become a public nuisance or not, is conflicting, a bill to abate it will be dismissed, without prejudice to the right of complainants to proceed by indictment or action at law.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 20 October Term 1889, Sup. Ct.; court below, No. 1 June Term 1885, C. P. in Equity.

On June 16, 1885, the City of New Castle filed a bill in equity against Leander Raney and John McClain, doing busi-

ness as Raney & McClain, the heirs of Wm. H. Brown, and the Etna Iron Works, charging that a certain mill-dam maintained by the defendants within the limits of the plaintiff city, in divers respects particularized, had become a public and common nuisance; praying: 1. That defendants be enjoined and restrained from maintaining said dam. 2. That said dam be declared a public nuisance and the defendants be ordered to remove and abate the same. 3. For other and further relief.

The cause having been put at issue by responsive answers and replication thereto, on September 28, 1885, *Mr. J. Norman Martin* was appointed examiner and master, who, upon the facts found by him, sufficiently appearing in the opinion of the court below, filed a report on March 3, 1888, concluding as follows:

The city of New Castle was incorporated under the act of assembly entitled: " An Act incorporating the city of New Castle, in the county of Lawrence," approved February 25, 1869, and subsequently became subject to and was incorporated under the act of assembly entitled " An Act dividing the cities of this state into three classes," etc. approved May 23, 1874. Under these acts and their several supplements, as a city of the third class it is invested with the sole charge and control of the public streets and highways within the city; the care and preservation of the public health and safety; the prevention, removal and abatement of nuisances, etc., as set forth in the first paragraph of plaintiff's bill of complaint. The answers of the defendants admit the allegations contained in this paragraph, but deny that the dam complained of is a public nuisance, or that there is any result from its maintenance that brings it within the scope of the city's authority under the acts cited. . . . . .

The dam complained of is not a nuisance per se. The erection of the brush dam for the purpose of supplying water power to operate the grist mill was a legitimate enterprise. So also was the erection of the present dam. The brush dam could not have been a nuisance, for it was isolated from other improvements and could not have interfered with the rights of others. But a business lawful and proper, may become a nuisance in view of the circumstances surrounding it. The increase of population, of buildings and business near the dam, may cause it to

become a nuisance. The ice gorge is injurious only because the ice and water are deposited on the property of the adjoining landowners, or upon the public streets, or in cellars, wells and privy vaults of the numerous inhabitants in the vicinity. The overflowing waters injure only those who dwell near the place of overflow. The stench can injure those alone who inhale it; while the lack of drainage can damage only those who live in the undrained sections. A mill-dam may be erected on a stream in the country, far removed from other improvements, and indeed the owner may build where he does for the very reason that he is removed from all possibility of injury to others. But a town is built around him and the vicinity of the dam becomes populous. If the dam throws ice and water on the property of a riparian owner, he has his action at law to recover compensation for the injury done. If the results are of such character and extent as to injure the public, then the dam becomes a public nuisance, and the maintenance which was lawful and proper becomes unlawful by reason of the increase of population and the change in conditions and surroundings: Wier's App., 74 Pa. 230; Wood on Nuisances, 18–21. Nor is it any defence that the business complained of has been carried on a long time; nor is it any justification that the parties injured or complaining came voluntarily within reach of the nuisance complained of, or that they have acquiesced in it: Fertilizing Co. v. Hyde Park, 97 U. S. 659; Philadelphia v. Carmany, 18 W. N. 152.

The defendants cannot permit the bottom of the dam to be raised by deposits of mud, filth, or any other accumulations, nor the width thereof to be contracted, to the prejudice of the city or riparian owners. And it is no defence that the deposits were wrongfully put there by others: Schuylkill Navigation Co. v. McDonough, 33 Pa. 73; Knoll v. Light, 76 Pa. 268. The owners of the dam had their right of action against those unlawfully depositing materials of any kind in the dam, both to recover for what had been done and to restrain the continual deposits alleged. But if an unlawful act was committed in putting material in the dam, the owners did nothing to remove it, and are liable for the results of their negligence: Knoll v. Light, supra. The right to maintain the dam within the city does not carry with it the right to permit the dam to become

either a public or a private nuisance, or to operate it in a manner injurious to either the city or the inhabitants thereof: Balt. & P. R. Co. v. Baptist Church, 108 U. S. 317. The people have the right to pure and wholesome air, and the atmosphere cannot be infected, lawfully, with noxious smells. It has been held that the comfort of the people is sufficient of itself to warrant the abatement of the alleged nuisance, but the health of the community is of paramount importance. The permitting the bed of the dam to become filled with rubbish, and the maintaining of the dam, whereby the health and comfort of the community are impaired, are irreparable injuries, and such as have heretofore been disposed of in proceedings. similar to this: Wood on Nuisances, 75, 76, 801. The streets, lanes, alleys, etc., are under the immediate control of the city, and it is the duty of the city to keep the same in good repair. The ice deposited in the city highways by reason of the maintenance of the dam, obstructs and hinders travel thereon. The public are entitled both to a free passage over and along a street, and to a free passage over any part or portion of the street that it may be desired to take. The hindering or obstructing of this right is a public nuisance, and as such would be indictable: Wood on Nuisances, title Highways, 235–333; Pittsburgh v. Scott, 1 Pa. 320.

But the right at law need not be first established: Bunnell's App., 69 Pa. 59; Commonwealth v. Rush, 14 Pa. 186. The right of the city to proceed to abate the nuisance by bill in equity exists. The damage is both to the property of the city, the streets, lanes, alleys, highways, etc., and to the health, property, and business of the citizens. For these injuries there is no adequate remedy at law. The injuries are irreparable, and the reports of England and the United States have numerous instances of the interference of courts for the protection of the public in similar cases: Mayor of London v. Bolt, 5 Ves. Jr., 129, and cases cited.

I do not sustain the position of the plaintiff or the allegations of the bill on the question of sewerage. While it is a fact that the dam as maintained hinders and makes less efficient the sewerage of the city, yet the same might be said of any business block or dwelling-house in the city. But the erection of a dwelling or any other private building or works,

on a line where a sewer could most advantageously be constructed, would not justify any court in declaring that building a nuisance. A wharf would not become an unlawful structure or a public nuisance because it hindered the city from building a sewer into the river at a particular point, and the dam in that respect differs in nothing from a wharf or private structure.

With this exception the allegations of plaintiff's bill of complaint are sustained and the master recommends that the prayer of the bill of the city of New Castle, plaintiff, against Leander Raney, John McClain, Emma Gordon, et al., be granted, and that a decree be made accordingly.

Various exceptions filed by both the plaintiff and the defendants were overruled by the master, and were renewed before the court on the filing of the report. The cause was then referred for determination to MEHARD, P. J., 35th district, who, having heard the arguments, on November 8, 1888, filed the following opinion and decree:

Exceptions to the report of the learned master have been filed by both parties, covering the entire ground of controversy. It will, therefore, be more convenient to consider this case in its several parts, rather than follow the order of the exceptions.

The defendants are owners of a grist-mill. They get power for its operation from a dam built across the Neshannock creek, within the limits of the city of New Castle. They and their predecessors have been in the enjoyment of this privilege since about 1817, and there is no evidence to justify a doubt as to their title. But the plaintiff complains that this dam has become a public nuisance, inflicting continued and constantly repeated wrongs, injuries and damage.

The facts alleged in support of this complaint are of three classes, to wit: First, that gravel, dirt, muck, filth and wash have accumulated in the bed of this dam, whereby the water in low stages has become stagnant, impure, unwholesome, dangerous and injurious to the public health; second, that the dam causes a frequent flooding of the streets and highways, as well as of a large area of the city in the vicinity of the stream, depositing ice and other drift in the streets and highways, rendering them impassable, occasioning great inconvenience to the

citizens and expense to the city, thus doing great injury to the public highways, flooding lots, buildings, cellars, vaults and wells of a portion of the city, to the health of the community and to the property, business occupations and trades of the inhabitants of the city; and, third, that the current of the stream is . impeded, the adjoining territory at times flooded, and thereby the proper drainage of a large portion of the city interfered with and prevented.

The defendants in their answer deny the general averments of nuisance and injury contained in plaintiff's bill, but instead of denying the particular facts averred, they set forth, in avoidance thereof, their title to the water power furnished by the dam, and allege that the buildings and improvements along Neshannock creek, within the city of New Castle, have been erected and made since the erection of said dam and the building of their mill, and with full knowledge of the facts; that said water power was private property and necessary to the working of the said mill; that the destruction of the dam would cause great loss and damage to them, and would entirely deprive them of their water power which itself is of great value; that if the dam is being filled with unhealthy material, this is being done by persons who have voluntarily settled upon the line of said creek, and for which defendants are not answerable; and finally that they cannot be deprived of the dam and water power without just compensation first made or secured by the plaintiff.

The evidence shows that sewers have been constructed by the city of New Castle, and by private persons, which empty into this dam; that besides the ordinary water and substances carried by these sewers, they conduct the contents of numerous water closets into the dam; that the bed of the dam has become polluted, and when the water is low it emits offensive odors.  These facts clearly appear without conflict of evidence, but the testimony on both sides does not agree as to whether this pool has been the source of sickness.  On behalf of plaintiff, Drs. J. K. Pollock, John Wallace and C. H. Lee were called.  The first named two describe with some care, the character of the substances which empty into this dam, and all agree that their presence there tends to beget disease.  This is not directly denied by any witness, but Drs. Blackwood and

James J. Wallace were called by the defendants. the former of whom says: "To my knowledge, that dam has not made the place unhealthy ; to my knowledge, I could not say that there has been any more sickness along the Neshannock than in other parts of the city." And the latter says : "By reason of this dam there is no more sickness along it than other parts of the city. There is less sickness in proportion to the population along the creek, in the flats, than on the hills some distance away from the stream. I think that the dam is not the cause of sickness ; I think there is no more sickness above the dam than there is below it."

It clearly appears that the Neshannock creek, above the dam, frequently overflows its banks, and floods the streets and highways in that part of the city. This rarely happens from high water alone, but is caused usually once a year, and sometimes twice, by ice gorges, which form about the beginning of the slack-water of the dam. At such times, ice in large quantities and masses is floated out on to the neighboring lands and highways, where it is deposited. The floods are naturally increased by ice gorges, so that the overflowing water and ice gorges greatly obstruct, and sometimes render for a time impassable, portions of the public highways of the city. The streets chiefly affected by these floods are Neshannock avenue, Water street, North Mill street, Main street and South Mill street.

These floods also fill the cellars of the dwellings and business houses as far as its waters can reach. The part of the city affected by these floods is thickly populated. The ground is made of sand and gravel largely. The water of the creek can therefore find its way into the cellars, not only by flowing directly in, but also by sinking into surrounding ground and neighboring vaults, and percolating into them.

The dwellings of this neighborhood have all been built since the erection of the dam and grist-mill. The evidence in behalf of the plaintiff clearly shows the facts just stated, and there is no evidence to the contrary. . . . . It further appears, by uncontradicted evidence, that the ice formed on the slackwater of this dam gets much thicker than above it, first, because it is still water there ; and second, by the sinking of the ice when the water is drawn off for the use of the mill and the overflowing of that, by water drawn from above, and the for-

mation of new ice on top of it. The witnesses infer that the resistance of the strong body of ice is the cause of the gorges, and as strengthening this influence, it appears that the course of that part of the stream is straight. While some particular instances of sickness, probably attributable to such floods, have been shown, it does not clearly appear that the public health has been affected by them.

It is not necessary to examine the ground of the third part of plaintiff's complaint, as a court of equity could not interfere with defendants' dam, in order to give plaintiff a more convenient place to empty its sewage.

Under the pleadings and proofs, plaintiff asks that defendants' dam be declared a public nuisance; that its removal be ordered, and that defendants be enjoined and restrained from maintaining it. It is objected by defendants in their answer, as well as through the able arguments of their counsel, "that said dam and water power is private property, lawfully belonging to these respondents, and that they cannot be deprived of the same without just compensation being first made or secured by the city." It is true that the defendants have lawful title to the dam, and the bill seeks an interference with their dominion, but it does not follow that this interference, even if it extend to the destruction of the dam, would be such a taking of private property as would entitle defendants to compensation. It would not be an anomaly for the law to remove this dam if it has become destructive of superior rights. The same thing, in principle and effect, is done when the court compels the owner to remove his pig-sty: Commonwealth v. VanSickle, 4 Clark 81; a powder house: Wier's App., 74 Pa. 230; or a suspension bridge: Pennsylvania v. Wheeling etc. Bridge Co., 13 How. 518. When private property is taken for public use, compensation must, of course, be made. But when a private structure becomes an encroachment upon public rights, or works common injury, its compulsory removal is not a taking for public use, but it is enforcing the restriction put on private dominion by civil compact, to wit: that property shall be enjoined reasonably, and not so as to become a public offence: Cooley's Const. Lim., 573; Wood on Nuisances, 29; Mugler v. Kansas, 123 U. S. 623.

It is urged with much earnestness on behalf of the defendants,

that the equity side of the court has no jurisdiction of the questions involved in this case.    This position is based on the sixth and ninth sections of article I. of our constitution, and narrows itself to the question : Whether it be the defendants' right to have the facts determined by the. jury.    The facts relating to the plaintiff's right and defendants' title are not in dispute. The plaintiff is a municipal corporation, charged with the care of the public within its borders.    It seeks the removal of the defendants' dam, not on the ground of paramount title, but because it impedes public travel and endangers public health. The disputed fact is, whether the dam works the wrongs complained of.    The constitution secures the right to have controverted questions of fact in common law cases decided by a jury : North Penna. Coal Co. v. Snowden, 42 Pa. 488 ; Tillmes v. Marsh, 67 Pa. 507 ; Haines's App., 73 Pa. 169 ; Barclay's App., 93 Pa. 50.    Hence, as the cases cited illustrate, a case which is covered by common law, and does not fall within the peculiar province of equity, is within the constitutional provision.    But if the wrong complained of be one for which the common law furnishes no adequate remedy, where such remedy is of a purely equitable nature, equity has jurisdiction, even to the exclusion of trial by jury.    When the constitution says " trial by jury shall be as heretofore, and the right thereof remain inviolate," it does not mean that wrong shall not be righted, because the tribunal, which alone can give a proper remedy, proceeds without a jury.    If defendants' dam causes continued and constantly repeated wrongs, injuries and damage to the public, represented by the plaintiff, it does not secure plaintiff's right, to punish defendants for their past transgressions.    The only effective remedy is to prevent further wrong. This requires an injunction, a purely equitable remedy.    The case is therefore within the jurisdiction of equity : Commonwealth v. Railroad Co., 24 Pa. 159 ; Stewart's App., 56 Pa. 413 ; McCallum v. Water Co. 54 Pa. 40 ; Wier's App., 74 Pa. 241 ; Pomeroy's Eq. J., 130, 221.    If this court has jurisdiction of the cause, it of course has power to determine the facts involved in it :, Phillip's App., 68 Pa. 130 ; Barclay's App., 93 Pa. 54.

Akin to this question of jurisdiction, and yet different in principle from it, is the question, whether the proofs are of a

character to warrant the exercise of equity power. For, the fact of nuisance not having been determined by verdict, unless the proof is clear and strong, an injunction should not be granted: Rhodes v. Dunbar, 57 Pa. 274; Wier's App., 74 Pa. 241; High on Inj., 744; Pomeroy's Eq. J., 1347.

So far as the first branch of plaintiff's charge is concerned, the proof is beyond doubt, that the bed and waters of this dam have been and are polluted, chiefly by emptying the contents of water closets into it. The testimony of an expert is hardly needed either to inform a court or jury, that such pollution, if it goes far enough, is both offensive and dangerous to the public. The dispute between the witnesses is, whether the dam has already been a source of disease. Under the evidence there is no doubt, that offensive odors arise from this dam when the water is low in the summer time. In view of the public location of the dam, this constitutes a public nuisance, just as Van-Sickle's pig-sty, 4 Clark 81, only on a larger scale. So far as the question of disease is concerned, we apprehend that when the nature of the pollution has been ascertained, and this is known to be dangerous to public health, and to be increasing in degree, a preventive remedy should be granted, without waiting for an epidemic actually to occur. But if this were the only respect in which the dam is injurious to the public, it would not follow that the remedy should extend to the demolition of the dam. Neither the city nor private persons have a right to empty substances of this nature into the creek to the detriment of defendants' dam. Hence a sufficient remedy might be found in causing a thorough cleansing of the bed of the pool of the dam, and preventing its further pollution.

But the second branch of the plaintiff's charge is more serious, if the proofs sustain it. As to this, the open question, under the evidence is, whether the ice gorges are caused by the dam, and we see no escape from the conclusion that they are. The formation of the ice on the slack-water of the dam is thicker and stronger than on the current above. This is testified to by witnesses who have observed the fact, and is what would naturally take place. This stronger ice resists the force of that which floats down from above, and checks its progress. This is testified to by witnesses living along the stream where the gorges occur, and likewise appeals to common observation.

Here is then sufficient cause for the ice gorges. The theory of the defendants, as we understand it, is, that the cause of these gorges is a contraction in the bed of the creek which occurs at or near the place where the gorges form, and continues to the crest of the dam, and which was made by artificial encroachments on the bed of the stream. This contraction exists and has been made, at least in part, by such encroachments. While the dam stands, this aids to check the flow of the water and ice, but if the dam were not there, the chief factor, if not the only effective one in causing the gorges, would be gone. We further agree with the learned master, that it is immaterial whether these encroachments were made by the defendants or by others. The question before us has to do with the dam and its surroundings as they exist, rather than with the culpability of the defendants. The evidence clearly shows that the streets and alleys, as well as the adjoining cellars and lots, of a large part of the city of New Castle are frequently inundated; that it is an exception when this does not take place in the spring of the year, and it sometimes occurs twice in a winter. This comes within the meaning of a continual nuisance and constantly recurring grievance. For by this "is not meant constant and increasing nuisance or injury, but a nuisance which occurs so often, and is so necessarily an incident of use of the property complained of, that it can be fairly said to be continuing though not constant or increasing:" Wood on Nuisances, 780. It has accordingly been decided that a nuisance that occurs only once a year, in times of high water or periodical freshets, is regarded a continuous nuisance: Ross v. Butler, 19 N. J. Eq. 294 (97 Am. Dec. 654). Moreover, assuming that the plaintiff could recover from the defendants the expenses in clearing and repairing its streets after such floods, this would not compensate the public for the inconvenience and delay suffered while the highways were in a dangerous or impassable condition. A sufficient remedy for this phase of the wrong might be found in an indictment if the injury were passed, but this is inadequate for an injury whose recurrence is as certain and as frequent as ice gorges at this dam.

It is not in the way of plaintiff's remedy that the dam was built before the city, or that defendants and those under whom they claim have been in possession of this water privilege for

Opinion of Court below.

seventy years. The law on this branch of the case is thus expressed by Mr. Justice READ, in the opinion delivered by him at nisi prius, in Rhodes v. Dunbar, 57 Pa. 274. Carrying on an offensive trade twenty years in a place remote from buildings and public roads does not entitle the owners to continue it in the same place after houses have been built and roads laid out in the neighborhood, to the occupants of which it is a nuisance: Commonwealth v. Upton, 6 Gray 473. As the city extends, such nuisances should be removed to the vacant grounds beyond the immediate neighborhood of the residences of the citizens. This, public policy, as well as the health and comfort of the population of the city, demands: Brady v. Weeks, 3 Barb. 159; and in Douglass v. State, 4 Wis. 387, it was held, that it is no defence to an indictment for maintaining a nuisance by means of a mill-dam, that it was created before any inhabitants had settled along the margin of the stream flowed by it. There is no such thing as a prescriptive right or any other right to maintain a public nuisance. We therefore conclude, that the injuries inflicted on the public in the city of New Castle by the existence of this dam are without justification, and that, being continuous and irreparable, they must be prevented.

While our conclusion is against the defendants, we are mindful that it works hardship to them; and that the injuries the public suffer by means of this dam have been brought about through the growth of the city, rather than by the fault of the defendants. It seems therefore just that the expense of removing the dam, as well as the costs of this suit, be borne by the plaintiff, unless defendants prefer to remove the dam themselves. It is therefore considered, adjudged and decreed, that defendants, without hindrance, permit the plaintiff, by its agents, workmen and laborers, after sixty days from the filing of this decree, to demolish and remove the dam complained of in plaintiff's bill; and defendants, and all claiming right through or under them, are forbidden and forever enjoined from building or maintaining the same; and further, that the costs of this case including the master's fee be paid by the plaintiff.

A decree having been entered in accordance with the foregoing, the defendants took this appeal, specifying that the court erred:

1. In the conclusions of the court from the evidence.

2. In ordering and decreeing that the city, after sixty days notice, should have the right and be permitted to remove and demolish the dam complained of.

*Mr. R. B. McComb* and *Mr. B. A. Winternitz* (with them *Mr. W. D. Wallace*), for the appellants:

1. "Nor" shall any man "be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land:" Constitution, § 1, article IX. The city has no right to abate a nuisance when a person's property is taken, without compensating the owners thereof. The act giving the city power to abate nuisances, where it takes away property, is clearly in violation of the constitution. The water power involved in this controversy has been in use for over seventy years. It was the means of bringing to New Castle the immense capital invested in its factories. It is worth more than all the real estate on both sides of the dam, and adjacent to it. And now, in order to increase the value of the property of a few owners 20 per cent, a chancellor is asked to decree the dam a public nuisance and thereby take away the defendants' property for the benefit of such owners.

2. But does the evidence clearly show that the defendants are guilty of maintaining a public nuisance? It is not the province of a court of equity to weigh the evidence in cases of this character; to take away jurisdiction it is enough that the evidence is conflicting: Story's Eq. J., § 924. If witnesses contradict each other in relation to the facts constituting a public wrong, equity will refuse to interfere, and to secure redress the parties must have recourse to their remedies at law : Rhodes v. Dunbar, 57 Pa. 274; Crowder v. Tinkler, 19 Ves. 617. Where a doubt exists as to the character, and illegality of the act complained of, and the evidence is contradictory, the court will not interfere until after trial at law, but in cases of nuisance will interfere only where the facts are clearly made out upon determinate and satisfactory evidence : 2 Story's Eq. J., § 924; Commissioners v. Long, 1 Pars. 146; Commonwealth v. Rush, 14 Pa. 186.

3. Moreover, a decree in equity is not of right, but of grace. A chancellor will refuse to enjoin, if in conscience it appear

he would do greater injury by enjoining than by leaving the parties to their redress by court and jury: Richards's App., 57 Pa. 105. A lawful business will be interfered with only when the evidence will not admit of a reasonable doubt; and, in considering the matter of damage to the complainant and the respondent, the chancellor should decide in favor of the party who would be the greater loser: McCaffrey's App., 105 Pa. 253; Grey v. Railroad Co., 1 Gr. 412; Hagner v. Heyberger, 7 W. & S. 107; Brightly's Eq., § 293; Wier's App., 74 Pa. 241. Again; to give equity jurisdiction in this case, the defendants must be guilty of a crime, the crime of maintaining a public nuisance. The city cannot be made the instrument by which or through which private wrongs may be redressed; it can only interfere for the protection of the public. An adequate remedy for a public nuisance is provided by indictment under § 73, act of March 31, 1860, P. L. 402. Let the defendants be indicted: Attorney General v. Cleaver, 18 Ves. 211.

*Mr. D. B. Kurtz* (with him *Mr. L. T. Kurtz* and *Mr. W. T. Burns*), for the appellee:

1. It is not necessary that a matter complained of as a nuisance should endanger the health of the neighborhood; it is sufficient if it produce that which is offensive to the senses, and which renders the enjoyment of life or property uncomfortable: Wood on Nuisances, §§ 17, 75, 76, 120, 495, 698; Smith v. Cummings, 2 Pars. 92; Dennis v. Eckhardt, 3 Gr. 390; Harrison v. St. Mark's Church, 3 W. N. 384; Ladies' Art Club's App., 22 W. N. 75. If the injuries complained of constitute a nuisance, the jurisdiction in equity clearly attaches: Stockdale v. Ullery, 37 Pa. 486; Wood on Nuisances, § 772; Brightly's Eq., §§ 288, 290, 292–3; 3 Pomery's Eq. J., § 1394; Bispham's Eq., § 439; Biddle v. Ash, 2 Ash. 211; Commonwealth v. Rush, 14 Pa. 186; Commissioners v. Long, 1 Pars. 143.

2. And it is not necessary that the right should first be established at law; for, if the right is clear and its violation established, an injunction will be granted if the nature of the injury is such as would warrant an injunction after verdict: Wood on Nuisances, § 777; Elk Co. v. Early, 121 Pa. 496;

Bunnell's App., 59 Pa. 59; Hacke's App., 101 Pa. 245; Rankin's App., 1 Mona. 308. The facts that the dam is useful, that it is valuable, that it was erected by authority of law, and that it has been of long continuance, do not prevent its being or becoming a nuisance: Wier's App., 74 Pa. 230; Fertilizing Co. v. Hyde Park, 97 U. S. 659. Legislative authority to a railroad company to bring its tracks within municipal limits, and to construct shops and engine houses there, does not confer authority to maintain a nuisance: Balt. & P. R. Co. v. Church, 108 U. S. 317; and in such case, there is no room for a calculation and comparison between the injuries and benefits which it produces: Pennsylvania v. Wheeling etc. Bridge Co., 13 How. 518.

3. A municipal corporation may maintain a bill, when the injury is one to property of the corporation and to citizens generally, as obstructions to public highways, etc., the ground of jurisdiction being the ability to give a more complete and perfect remedy: Commissioners v. Long, 1 Pars. 143; Mayor of London v. Bolt, 5 Ves. 129; Philadelphia v. Carmany, 18 W. N. 152; North Manheim Tp.'s App., 22 W. N. 149; Frankford Bor. v. Lennig, 2 Phila. 403; 2 Dillon Mun. Corp., § 659. Nor, is the decree in this case an infringement of the defendants' constitutional rights. The better and larger definition of due process of law is, that it means law in its regular course of administration through courts of justice: Byers v. Commonwealth, 42 Pa. 89; 3 Story's Com., 264, 661; Murray v. Hoboken etc. Co., 18 How. 272; Pennsylvania v. Wheeling etc. Bridge Co., 13 How. 519. Police powers may reach to the destruction of private property, or to the removal of it, at the expense of the owner, and in neither case is compensation a condition of the exercise of the power: Philadelphia v. Scott, 81 Pa. 80; Mugler v. Kansas, 123 U. S. 623.

OPINION, MR. CHIEF JUSTICE PAXSON:

The mill-dam in this case is not a nuisance per se. The master so finds, and the evidence fully warrants it. If a nuisance at all, it has become so by the gradual growth of the city of New Castle around it, and the emptying of cess-pools into it. The dam, in some shape, has been in existence for over half a century, and the water power therefrom has been used

for milling and manufacturing purposes. At present, it is only used for a flour-mill, which, in times of low water, is operated by steam. It is not denied that the water power is valuable, and that its destruction would entail a serious loss on the owner. The city of New Castle filed this bill, praying the court below to decree the dam a nuisance, and order its removal. The bill avers that it is "a public and common nuisance; is greatly injurious to the public streets, highways, safety, health, and general welfare of said city, and seriously affects and damages the inhabitants thereof in their property, business, and occupations, and interferes with and prevents the proper drainage of a large part of the territory." The learned master has found the dam to be a public nuisance, which finding was approved by the learned court below, and a decree entered for its removal. From this decree the defendants have appealed.

While it may be conceded that a business which is useful and necessary may become a nuisance by reason of the growth of a village or town around it, yet there is a manifest distinction between such case and that of a man who seeks to establish an offensive business in a thickly populated neighborhood. It was said by Justice SHARSWOOD in Wier's App., 74 Pa. 230: "There is a very marked distinction to be observed in reason and equity between the case of a business long established in a particular locality, which has become a nuisance from the growth of population and the erection of dwellings in proximity to it, and that of a new erection threatened in such a vicinity. Carrying on an offensive trade, for any number of years, in a place remote from buildings and public roads, does not entitle the owner to continue it in the same place after houses have been built and roads laid out in the neighborhood, to the occupants of which, and travelers upon which, it is a nuisance. As the city extends, such nuisances should be removed to the vacant grounds beyond the immediate neighborhood of the residences of the citizens. . . . . It certainly ought to be a much clearer case, however, to justify a court of equity in stretching forth the strong arm of injunction to compel a man to remove an establishment in which he has invested his capital, and been carrying on business for a long period of time, than in the case of one who comes into a neighborhood proposing to establish

such a business for the first time, and who is met at the threshold of his enterprise by a remonstrance and notice that if he persists in his purpose application will be made to a court of equity to prevent him." We may supplement these well-considered remarks by saying that they apply with especial force to a case where the property alleged to be a nuisance cannot be removed, and a decree to abate it means its destruction. In such cases a court of equity should move slowly, and decline to act upon conflicting evidence.

We do not question the power of a court of equity to restrain and abate public nuisances. This is settled by a line of decisions. But the authorities uniformly limit the jurisdiction to cases where the right has first been established at law, or is conceded. It was never intended, and I do not know of a case in the books where a chancellor has usurped the functions of a jury, and attempted to decide disputed questions of fact, and pass upon conflicting evidence in such cases. The learned master below held that "the right at law need not be first established," and cites in support of his ruling Commonwealth v. Rush, 14 Pa. 186, and Bunnell's App., 69 Pa. 59.

It requires but a glance at those cases to see that they are not authority for such position. In Commonwealth v. Rush the aid of equity was invoked to restrain the erection of a dwelling-house upon a public square of the city, and the facts were admitted by the pleadings. There was no disputed question of fact. Such an erection was a nuisance per se. The learned judge who heard the case below, in Commonwealth v. Rush, delivered an elaborate opinion, in which he discusses this subject, and cites numerous authorities, after which he said: "The principle, then, appears to be that where the bill is filed by the attorney general, and the right is clear, and the threatened injury irreparable, an injunction will be awarded, although the right has not been established at law. And that this is in accordance with the fifth clause of the act of assembly, above referred to, giving equity jurisdiction to this court, is clearly stated in the case of Hagner v. Heyberger, 7 W. & S. 107, by Mr. Justice SERGEANT, who says: 'The object of this clause was to provide adequate redress in cases where, although an action at law was maintainable, yet the injury might be irreparable, and it was necessary to justice to step in and prevent

its being committed by a summary process. Thus, if there were sufficient ground to believe, in consequence of threats or otherwise, that an individual was about committing waste in timber, etc., or that a corporation was grossly abusing its privileges, or that a public officer was destroying, or about to destroy, public books, . . . . . or, in short, any act was doing, or likely to be done, for which damages could not, perhaps, compensate, and the legal redress might be too tardy and inefficient, which was in the nature of misfeasance, nuisance, waste, spoil, or destruction of property, and the act was contrary to law, and injurious to the community or individuals, a summary remedy is given, by the strong arm of an injunction, to stop it, or prevent its being done.' " I have quoted this extract from the opinion of the court below in Commonwealth v. Rush because the case was affirmed here upon said opinion, and it thus became in a measure the opinion of this court. It promulgates a doctrine which no one denies, that where the right is clear a court of equity may, in extreme cases, where irreparable injury is threatened or being done, and prompt action is necessary to avert it, interpose by an injunction. But such vigorous and speedy remedy can hardly be held to apply to a mill-dam which has been in existence for over half a century.

In Bunnell's Appeal, the syllabus, which correctly indicates the point decided, is as follows: " A road was laid out in 1820 through Bunnell's land. In 1868 he erected a ' stone row ' across what was alleged to be the road. In a proceeding in equity to restrain him from maintaining the erection, etc., alleging it to be a public nuisance and a special injury to the plaintiff, the evidence was conflicting as to whether the road had been opened by the supervisor, where it had been opened, and that the route of the road had been frequently changed, etc. Held, that the proceeding in equity could not be maintained, (1) because of the uncertainty of the location of the road; (2) that there was a full remedy at law; (3) that the injury was not permanent and irreparable." In that case it was said by Mr. Justice AGNEW that " the mere fact that there is a remedy at law by indictment or action will not alone prevent the exercise of the power [equity], but it is a reason why the jurisdiction of chancery should be confined to cases of a very plain character, where the injury is irreparable, and cannot await the slow progress of the legal redress."

Opinion of the Court.

No one doubts the jurisdiction of a court of equity in the case of a nuisance per se, such as a bone-boiling establishment, a swine-yard, or pig-sty, or other similar establishment. So with obstructions to public highways. But, as before observed, this mill-dam is not a nuisance per se. Whether it is a nuisance at all depends upon the testimony, and that is conflicting. This is especially so as regards the matter of the health of the city. Two physicians of repute, who reside in and practice in New Castle, testify that the dam has not increased the sickness of the city, and that it is as healthy in the vicinity of the dam as in other parts of the city. The city has been slow in finding out that it is a nuisance; and, after waiting all these years, it cannot be said with truth that there is any such urgency as demands the severe and summary remedy by injunction, until the character of the alleged nuisance has been passed upon by a jury. It is an easy and short way for the city to get rid of the dam. It involves no compensation to the owner, and imposes no burden upon it. The testimony leaves no doubt but that many of the citizens of New Castle are anxious to have the dam removed. One of them testifies that it would benefit his property to the amount of $2,000. Others have doubtless testified under the bias which self-interest creates.

We think that, under all the circumstances of this case, the defendants are entitled to a trial by jury before their property shall be condemned as a nuisance, and destroyed. The city may, if it sees proper, proceed against the defendants by an indictment, or by a suit at common law. When the right is thus settled, then, and not till then, will jurisdiction attach in equity. Non constat that the defendants, after a verdict, should one be rendered against them, will subject themselves to the expense of a bill, but will voluntarily abate the nuisance. If we sustain this bill, I can hardly imagine a case in which we could deny the jurisdiction, no matter how disputed the facts may be, or contradictory the testimony. Heretofore the jurisdiction of equity has been confined to nuisances per se, or when the right is clear, or has been settled by the verdict of a jury. We think it better to adhere to the beaten track.

The decree is reversed, and the bill dismissed, at the cost of the appellees, but without prejudice to their right to proceed by indictment or suit at common law.